regard to the disclaimer advice claim, we conclude that the district court erred when it concluded on summary judgment that the statute of limitations barred the claim based on its determination that the O'Daniels were put on inquiry notice of the claim when they learned the amount of the tax liability in April 2002. We therefore reverse the order granting summary judgment in favor of Murray on the disclaimer advice claim, and we remand the cause for further proceedings on the claim. With regard to the QTIP election claim, we conclude that the district court erred when it concluded that the statute of limitations barred the claim and when it concluded that the O'Daniels failed to put on evidence of damages proximately caused by Murray's alleged negligence. We therefore reverse the order granting a directed verdict in favor of Murray on the QTIP election claim, and we remand the cause for further proceedings on the claim. With regard to Murray's cross-appeal, we find no merit to the cross-appeal and we set forth standards regarding questions of law and questions of fact in a legal malpractice case that should be applied in the proceedings on remand.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.

MILLER-LERMAN, J., participating on briefs.
WRIGHT, McCORMACK, and CASSEL, JJ., not participating.

———————

IN RE APPLICATION A-18503, WATER DIVISION 2-D.
MIDDLE NIOBRARA NATURAL RESOURCES DISTRICT ET AL.,
APPELLANTS, V. DEPARTMENT OF NATURAL RESOURCES
AND NEBRASKA PUBLIC POWER DISTRICT, APPELLEES.

___ N.W.2d ___

Filed October 4, 2013.    No. S-12-1166.

1.  **Administrative Law: Appeal and Error.** In an appeal from a Department of Natural Resources order, an appellate court reviews whether the director's factual determinations are supported by competent and relevant evidence and are not arbitrary, capricious, or unreasonable.

2.  ____: ____. In an appeal from a Department of Natural Resources order, an appellate court independently reviews questions of law decided by the director.

3. **Jurisdiction: Judgments.** A jurisdictional issue that does not involve a factual dispute presents a question of law.

4. **Standing: Jurisdiction: Parties.** Standing is a jurisdictional component of a party's case because only a party who has standing may invoke the jurisdiction of a court.

5. **Actions: Parties: Standing.** A party has standing to invoke a court's jurisdiction if it has a legal or equitable right, title, or interest in the subject matter of the controversy.

6. \_\_\_\_: \_\_\_\_: \_\_\_\_. A party must have standing before a court can exercise jurisdiction, and either a party or the court can raise a question of standing at any time during the proceeding.

7. **Standing.** Under the doctrine of standing, a court may decline to determine merits of a legal claim because the party advancing it is not properly situated to be entitled to its judicial determination. The focus is on the party, not the claim itself.

8. **Standing: Jurisdiction: Claims: Parties.** Standing requires that a litigant have such a personal stake in the outcome of a controversy as to warrant invocation of a court's jurisdiction and justify exercise of the court's remedial powers on the litigant's behalf. Thus, generally, a litigant must assert the litigant's own rights and interests, and cannot rest a claim on the legal rights or interests of third parties.

9. **Actions: Standing: Complaints: Justiciable Issues: Proof.** To establish standing, a litigant must first clearly demonstrate that it has suffered an injury in fact. That injury must be concrete in both a qualitative and a temporal sense. The complainant must allege an injury to itself that is distinct and palpable, as opposed to merely abstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical. Second, the litigant must show that the injury can be fairly traced to the challenged action and is likely to be redressed by a favorable decision.

Appeal from the Department of Natural Resources. Affirmed.

Donald G. Blankenau, Thomas R. Wilmoth, and Vanessa A. Silke, of Blankenau, Wilmoth & Jarecke, L.L.P., for appellants.

Jon Bruning, Attorney General, Justin D. Lavene, and Blake E. Johnson for appellee Department of Natural Resources.

Stephen D. Mossman and Patricia L. Vannoy, of Mattson, Ricketts, Davies, Stewart & Calkins, for appellee Nebraska Public Power District.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

HEAVICAN, C.J.

# I. INTRODUCTION

The Nebraska Public Power District (NPPD) filed with the Department of Natural Resources (DNR) an application to appropriate additional surface water from the Niobrara River. As relevant to this appeal, Middle Niobrara Natural Resources District and Lower Niobrara Natural Resources District (collectively NRD's) and Thomas Higgins each filed amended objections to the application. We note that during the pendency of this appeal, a fourth party who also held existing and pending water appropriations is now deceased and thus dismissed from this action. We therefore will refer only to the remaining three appellants. The DNR dismissed all objections sua sponte. The NRD's and Higgins appeal those dismissals. We affirm.

# II. BACKGROUND

NPPD filed application A-18503 with the DNR on or about April 16, 2007. The application requested the appropriation of an additional 425 cubic feet per second (cfs) of natural flow from the Niobrara River to add to the 2,035 cfs already appropriated to NPPD in order to fulfill the entire capacity of the hydropower units at NPPD's hydropower facility, Spencer Dam. Notice of NPPD's application was published on March 15, 2012.

The NRD's and Higgins each filed objections to NPPD's application. The NRD's are political subdivisions of the State of Nebraska, charged with managing ground water within the borders of their districts; Higgins is the owner of real property in the Niobrara River Basin and, in relation to NPPD, holds senior existing and pending Niobrara River surface water appropriations.

As noted above, the objections and requests for hearings were dismissed sua sponte by the DNR. In the DNR's order of dismissal, the director concluded that the objectors lacked standing. In particular, the NRD's did not

> allege any legal right, title, or interest in the subject water of the Niobrara River. In addition, their allegations of harm are based upon mere conjecture that granting

A-18503 with its April 11, 2007, priority will cause a portion of the basin to be declared fully appropriated sometime in the future.

The director concluded that Higgins' pending application did not confer standing because no legal right existed with a pending application. The director further found that even if those applications were granted and perfected, they, along with Higgins' existing appropriations, would be senior and upstream of A-18503. As such, the director did not find Higgins' allegations of harm credible. The director also noted that any allegation of harm by hypothetical taxation by a natural resources district was speculative and not distinguishable from harm caused to any other landowner within the natural resources district. Finally, the director noted the allegation that granting A-18503 was against the public interest was a conclusion of law and not an allegation of fact.

The NRD's and Higgins appealed.

## III. ASSIGNMENTS OF ERROR

The appellants assign as error, restated and renumbered, that the director (1) erred in concluding that the NRD's lacked a legally cognizable interest to confer standing to object, (2) erred in concluding that Higgins would not be adversely affected in a manner sufficient to confer standing to object, (3) applied an improper standard of review, and (4) failed to consider the impact of granting the application on the public interest.

## IV. STANDARD OF REVIEW

[1,2] In an appeal from a DNR order, we review whether the director's factual determinations are supported by competent and relevant evidence and are not arbitrary, capricious, or unreasonable.[1] But we independently review questions of law decided by the director.[2]

---

[1] *Middle Niobrara NRD v. Department of Nat. Resources*, 281 Neb. 634, 799 N.W.2d 305 (2011).

[2] See *id*.

[3,4] A jurisdictional issue that does not involve a factual dispute presents a question of law.[3] Standing is a jurisdictional component of a party's case because only a party who has standing may invoke the jurisdiction of a court.[4]

## V. ANALYSIS

### 1. STANDING

[5,6] The primary issue on appeal in this case is whether the DNR was correct in concluding that the appellants lacked standing. A party has standing to invoke a court's jurisdiction if it has a legal or equitable right, title, or interest in the subject matter of the controversy.[5] A party must have standing before a court can exercise jurisdiction, and either a party or the court can raise a question of standing at any time during the proceeding.[6]

[7,8] Under the doctrine of standing, a court may decline to determine merits of a legal claim because the party advancing it is not properly situated to be entitled to its judicial determination. The focus is on the party, not the claim itself.[7] And standing requires that a litigant have such a personal stake in the outcome of a controversy as to warrant invocation of a court's jurisdiction and justify exercise of the court's remedial powers on the litigant's behalf.[8] Thus, generally, a litigant must assert the litigant's own rights and interests, and cannot rest a claim on the legal rights or interests of third parties.[9]

[9] Specifically, a litigant first must clearly demonstrate that it has suffered an injury in fact.[10] That injury must be concrete

---

[3] *Id.*

[4] *Waste Connections of Neb. v. City of Lincoln*, 269 Neb. 855, 697 N.W.2d 256 (2005).

[5] *Central Neb. Pub. Power Dist. v. North Platte NRD*, 280 Neb. 533, 788 N.W.2d 252 (2010).

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] See *id.*

in both a qualitative and a temporal sense. The complainant must allege an injury to itself that is distinct and palpable, as opposed to merely abstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical.[11] Second, the litigant must show that the injury can be fairly traced to the challenged action and is likely to be redressed by a favorable decision.[12]

### (a) NRD's

The appellants first assign the DNR erred in finding that the NRD's lacked standing. In its order, the DNR concluded that the NRD's lacked standing because they failed to allege any legal right, title, or interest in the subject water of the Niobrara River and, further, that their allegations were based upon mere conjecture that the granting of the application would cause a portion of the Niobrara River Basin to be declared fully appropriated in the future.

The NRD's cite to the Nebraska Ground Water Management and Protection Act[13] and this court's opinion in *Middle Niobrara NRD v. Department of Nat. Resources*[14] to support the assertion that they have standing because they are responsible for the management of ground water that is hydrologically connected to the Niobrara River and its tributaries. The NRD's contend that "[i]n a very real sense, the Districts manage much of the very same waters NPPD will appropriate by A-18503, but at a different time and location."[15] The NRD's argue that A-18503 is connected to prior and ongoing proceedings concerning the Niobrara River and Spencer Dam and that it is foreseeable that diverting still more water for the Spencer Dam will increase the likelihood that the Niobrara River will be designated as fully appropriated. In further support of this argument, the NRD's direct this court to primarily

---

[11] *Id.*

[12] *Id.*

[13] Neb. Rev. Stat. §§ 46-701 to 46-754 (Reissue 2010 & Cum. Supp. 2012).

[14] *Middle Niobrara NRD v. Department of Nat. Resources, supra* note 1.

[15] Brief for appellants at 11.

federal case law suggesting that "*threatened* injury can satisfy standing requirements."[16] They also argue that the granting of the application will "preclude other local interests from obtaining rights to that water and that doing so may limit the future tax base of the NRDs, on which they rely to manage ground water."[17]

These arguments are without merit. This court did find, in *Middle Niobrara NRD*, that a natural resources district was an "interested party" and had standing to challenge the DNR's designation of a river basin as fully appropriated. In *Middle Niobrara NRD*, this court noted that ordinarily a natural resources district lacked "water rights adversely affected" by a DNR order and that as such, a natural resources district would lack standing.[18] But we noted that the situation in *Middle Niobrara NRD* was different: "[U]nlike our earlier cases, the [DNR's] action [in designating the river basin as fully appropriated] triggers duties for the [natural resources districts] that will require them to spend public funds. . . . Neb. Rev. Stat. § 77-3442(4)(c) (Reissue 2009) supports this claim."[19] We concluded that "because the [natural resources districts] have fiduciary duties with regard to the public funds that they are charged with raising and controlling, they have standing to challenge state action that requires them to spend those funds."[20]

We disagree with the contention made by the NRD's that in the case at bar their interests are "substantially the same" as those that conferred standing in *Middle Niobrara NRD*.[21] Standing under *Middle Niobrara NRD* was premised on the duties placed upon a natural resources district by the Nebraska Ground Water Management and Protection Act once a fully

---

[16] *Id*. (emphasis in original).

[17] *Id*. at 12.

[18] *Middle Niobrara NRD v. Department of Nat. Resources*, *supra* note 1, 281 Neb. at 646, 799 N.W.2d at 315.

[19] *Id*.

[20] *Id*. at 647, 799 N.W.2d at 315-16.

[21] Brief for appellants at 7.

appropriated designation had been made—duties which do not exist here because no fully appropriated determination has been made. We cannot conclude that a party has standing because an application *might* be granted, which then *might* lead to a fully appropriated designation. To do so would be to find standing based upon speculation; years of Nebraska case law prohibit the conferring of standing under such circumstances.

And the reliance by the NRD's on federal case law holding that a "threatened" injury can be sufficient to establish standing is not persuasive. Nebraska case law is clear that an injury in fact must be "concrete," "actual and imminent," and "requires a more particularized harm to a more direct, identified interest."[22] The speculative claims made by the NRD's cannot confer standing under existing Nebraska case law, and we decline to disregard that authority.

Finally, the NRD's contend that the appropriation will preclude the use of that water for irrigation and limit their tax base. But such claim is speculative: We noted in *Central Neb. Pub. Power Dist.* that "[i]t is axiomatic that any use of a limited resource necessarily results in marginally less availability of that resource for potential use by others. An injury in fact, for standing purposes, requires a more particularized harm to a more direct, identified interest."[23]

The DNR did not err in dismissing the objections by the NRD's for lack of standing. The appellants' first assignment of error is without merit.

### (b) Higgins

The appellants next assign that the DNR erred in finding that Higgins lacked standing. The DNR found that Higgins claimed to hold current surface water appropriations and was an applicant for further Niobrara River appropriations. But the DNR concluded that Higgins failed to allege sufficient

---

[22] *Central Neb. Pub. Power Dist. v. North Platte NRD, supra* note 5, 280 Neb. at 544, 788 N.W.2d at 261.

[23] *Id.* at 543-44, 788 N.W.2d at 261.

allegations of harm and thus did not have standing to object to A-18503.

In his objections, Higgins alleged that the granting of the application "may" increase his property taxes, and also that it "may" affect the value of his real property. Higgins further alleged that the granting of the application would affect his existing appropriations and would increase the cost of his pending applications.

We find that Higgins' allegations that the granting of the application "may" increase his taxes and affect the value of his real property are both speculative, and not "actual or imminent." As such, both are insufficient to confer standing. Nor are his allegations that the granting of the application will affect his existing appropriations and increase the cost of his pending applications sufficient to confer standing. Those allegations fail to explain how his rights would be affected when all are both upstream and senior to the appropriation requested in A-18503. Moreover, as noted above, we held in *Central Neb. Pub. Power Dist.* that the fact the application might result in less water overall in the Niobrara River for Higgins' use is not a sufficiently "particularized harm to a more direct, identified interest."[24]

The DNR did not err in dismissing Higgins' objections for lack of standing. The appellants' second assignment of error is without merit.

## 2. Standard of Review

In the appellants' second assignment of error, they argue that the DNR applied an incorrect standard of review when it dismissed the appellants' objections for lack of standing because the DNR failed to assume the allegations were true and to view them in a light most favorable to the appellants.

We reject the contention that the appropriate standard was not utilized by the DNR in assessing the appellants' objections. The appellants lack standing, but not because the DNR failed to assume that the allegations were true and did not view them in a light most favorable to the appellants. Rather, they lack

---

[24] *Id.* at 544, 788 N.W.2d at 261.

standing because even when the allegations are assumed as true and viewed in a light most favorable to the appellants, the allegations failed to allege either an interest or an injury sufficient to confer standing. As we concluded above, the allegations of the NRD's failed to establish an interest and the allegations of all the appellants were speculative, not alleged to be actual or imminent, and were not a sufficiently "particularized harm to a more direct, identified interest."[25] This assignment of error is without merit.

### 3. Public Interest

In the appellants' third assignment of error, they argue that Neb. Const. art. XV, § 6, allows the DNR director to deny an application to appropriate water if "'demanded by the public interest,'" and further contend that A-18503 is not in the public interest.[26] The appellants assert that this "bolsters" the standing argument.[27]

But the fact that the granting of an application might not be in the public interest says nothing about whether the appellants have standing in this case. This court has specifically held that natural resources districts cannot assert the public interest.[28] Nor can Higgins. The right and injury asserted in order to establish standing must be the litigant's own: "[I]t is not sufficient that one has merely a general interest common to all members of the public."[29] The appellants' final assignment of error is without merit.

### VI. CONCLUSION

The DNR's dismissal of the appellants' objections for lack of standing is affirmed.

AFFIRMED.

---

[25] *Id.*

[26] Brief for appellants at 16.

[27] *Id.*

[28] *Ponderosa Ridge LLC v. Banner County*, 250 Neb. 944, 554 N.W.2d 151 (1996).

[29] *Waste Connections of Neb. v. City of Lincoln, supra* note 4, 269 Neb. at 862, 697 N.W.2d at 263.

STEPHAN, J., concurring in part, and in part dissenting.

I concur in the majority opinion to the extent that it affirms the dismissal by the Department of Natural Resources (Department) of the two natural resources district (NRD) appellants for lack of standing. But I dissent from the majority's similar disposition with respect to appellant Thomas Higgins. I write separately to state my reasons for both positions.

## NRD APPELLANTS

Our holding in *Middle Niobrara NRD v. Department of Nat. Resources*[1] recognized an exception to the general rule that an NRD does not have standing to object to an appropriation application when it does not have a water right that would be adversely affected by the application. *Middle Niobrara NRD* was an appeal from the Department's designation, pursuant to the Nebraska Ground Water Management and Protection Act (Act),[2] that a river basin was fully appropriated. We reasoned that because this designation would require an affected NRD to expend public funds pursuant to the Act, the NRD had standing to challenge the designation. We noted that a contrary holding "would leave political subdivisions at the mercy of superior agencies with no redress for actions that improperly or arbitrarily and capriciously require them to spend public funds."[3]

I am not persuaded that we should expand this exception to recognize the standing of an NRD to object to an appropriation which "may result in a fully appropriated determination by [the Department] in the future which will cause increased costs," as the NRD appellants allege in this case. As the majority correctly notes, the alleged injury in fact necessary to confer standing cannot be conjectural or hypothetical and must be capable of redress by a favorable decision in the

---

[1] *Middle Niobrara NRD v. Department of Nat. Resources*, 281 Neb. 634, 799 N.W.2d 305 (2011), citing *Metropolitan Utilities Dist. v. Twin Platte NRD*, 250 Neb. 442, 550 N.W.2d 907 (1996).

[2] Neb. Rev. Stat. §§ 46-701 to 46-754 (Reissue 2010 & Cum. Supp. 2012).

[3] *Middle Niobrara NRD, supra* note 1, 281 Neb. at 647, 799 N.W.2d at 315.

proceeding.[4] Here, the Department's resolution of *this case* will not require the NRD appellants to expend public funds. Even if the Department grants the application of the Nebraska Public Power District (NPPD), such grant is not a determination by the Department that the basin is fully appropriated. Instead, the effect of the resolution of this case on any subsequent determination by the Department as to whether the basin is fully appropriated is completely speculative.

Given the complexity of water regulation in Nebraska, I cannot endorse a legal principle which requires a court to predict whether a particular surface water appropriation would "trigger" a subsequent fully appropriated designation in order to determine whether an NRD has standing to object to the appropriation.[5] No single appropriation causes a river basin to become "fully appropriated." As we noted in *Middle Niobrara NRD*, the Department's determination of whether a basin is fully appropriated focuses on whether the river's surface water is sufficient to sustain all existing appropriations. One could logically argue that *any* appropriation, from the most senior to the most junior, could eventually trigger a fully appropriated determination in the sense that it contributes to the aggregate total of appropriations which could be determined to exceed the water supply. By accepting the NRD appellants' standing argument in this case, we would essentially be saying that an NRD has standing to challenge *any* surface water appropriation, a proposition that we have previously rejected.

Finally, it is my view that it is not the proper role of an appellate court to engage in the calculus of whether a river basin would become fully appropriated under particular factual circumstances in advance of a determination of that issue by the Department. The Act requires the Department to annually evaluate "the expected long-term availability of hydrologically connected water supplies *for both existing and new surface water uses and existing and new ground water*

---

[4] See *Central Neb. Pub. Power Dist. v. North Platte NRD*, 280 Neb. 533, 788 N.W.2d 252 (2010).

[5] See *Middle Niobrara NRD, supra* note 1, 281 Neb. at 645, 799 N.W.2d at 314.

*uses* in each of the state's river basins" in order to determine if the basin is "fully appropriated."[6] Our role is to hear and decide appeals from such administrative determinations,[7] applying a standard of review which requires us to affirm the Department's factual determinations if they are supported by competent and relevant evidence and are not arbitrary, capricious, or unreasonable.[8] Were we to engage in a standing analysis requiring that we determine whether a particular appropriation would likely "trigger" a subsequent fully appropriated determination, our ability to objectively consider an appeal from any subsequent determination by the Department could be questioned.

For these reasons, I agree with the conclusion of the majority that the Department did not err in concluding that the NRD appellants lacked standing to challenge the NPPD application.

## Higgins

Unlike the NRD appellants, Higgins' claim to standing is based on his own water rights. Specifically, he alleges that he holds four surface water appropriations upstream from NPPD's facility and that he has a pending application for another appropriation. These allegations identify a specific legally protectable interest. The key inquiry with respect to standing is whether Higgins has adequately alleged that granting NPPD's application would cause an injury in fact to that interest.

Some of Higgins' allegations fall short of the mark in this regard. His allegation that the requested NPPD appropriation "is contrary to the public interest" does not allege any particularized injury to his interests as distinguished from that of the public at large. And his allegations that granting the application "may increase his property taxes" and "may adversely impact the value of his real property, and real estate values" throughout the basin are clearly speculative.

---

[6] § 46-713(1)(a) and (b) (emphasis supplied).

[7] See Neb. Rev. Stat. § 61-207 (Reissue 2009).

[8] See *Middle Niobrara NRD, supra* note 1.

But Higgins also alleges that granting the application "will adversely impact his existing appropriations" and "will preclude or otherwise increase the cost of" his pending application for an additional appropriation. While these allegations provide no explanation as to *how* the appropriation would adversely affect Higgins' water rights, I regard them as sufficient notice pleading to preclude summary dismissal for lack of standing. As noted in the separate dissent, we held in *Ponderosa Ridge LLC v. Banner County*[9] that landowners having "water use interests to protect" had standing to challenge an agreement which would have transferred ground water from a Nebraska well to Wyoming. Similarly, in *Hagan v. Upper Republican NRD*,[10] we held that irrigators challenging a ground water agreement between an NRD and a hog confinement facility had established standing sufficient to overcome a demurrer by alleging that the agreement would result in depletion of an aquifer to the detriment of their own water use interests. We noted that this holding did not prevent the defendants from challenging the irrigators' standing at a later date if they were unable to prove their allegations regarding injury in fact.

In dismissing Higgins' objection on its own motion, the Department acted pursuant to a regulation which authorizes the director to "dismiss a complaint or objection without holding a hearing when it is found there is a lack of jurisdiction or of authority to grant the relief requested."[11] Because no hearing was held and no evidence received, the Department could assess only the facial adequacy of Higgins' allegations with respect to standing. But instead, the Department addressed the merits of Higgins' allegations without giving him an opportunity to be heard on the issue.

In an appeal from a district court's order sustaining a motion to dismiss a civil action, we conduct a de novo review in which we accept all the factual allegations in the complaint as true

---

[9] *Ponderosa Ridge LLC v. Banner County*, 250 Neb. 944, 948, 554 N.W.2d 151, 156 (1996).

[10] *Hagan v. Upper Republican NRD*, 261 Neb. 312, 622 N.W.2d 627 (2001).

[11] 454 Neb. Admin. Code, ch. 7, § 005 (2012).

and draw all reasonable inferences for the nonmoving party.[12] I would apply the same standard of review here and conclude that Higgins' allegations of injury in fact were sufficient as notice pleading and that the Department erred in dismissing him on its own motion.

McCormack, J., joins in this concurrence and dissent.

---

[12] *DMK Biodiesel v. McCoy*, 285 Neb. 974, 830 N.W.2d 490 (2013); *Lindner v. Kindig*, 285 Neb. 386, 826 N.W.2d 868 (2013).

Connolly, J., dissenting.

I dissent from the majority opinion's holding that the appellants lack standing to object to the application of the Nebraska Public Power District (NPPD). The majority opinion ignores evidence of imminent harm that will result from an approval of the application. It ignores our own case law recognizing that landowners had standing in similar cases. And it misconstrues our case law to create inappropriate hurdles to standing.

Under Neb. Rev. Stat. § 61-206 (Reissue 2009), the Department of Natural Resources (Department) has jurisdiction to hear and adjudicate all "complaints, petitions, or applications" in any matter pertaining to water rights for irrigation, power, or other beneficial purposes, except where its authority is limited by statute.[1] The three appellants—two natural resources districts (NRDs) and Thomas Higgins, an existing surface water appropriator in the Lower Niobrara River Basin— filed their objections under the Administrative Procedure Act (APA) and title 454, chapter 7, of the Department's regulations. The APA permits parties to petition for a hearing in a "contested case." This means any proceeding in which a state agency is required to determine a party's legal rights, duties, or privileges.[2]

The Department's regulations define adjudicative proceedings to include cases to approve applications or petitions. The regulations also define applications to include an application to

---

[1] See *In re 2007 Appropriations of Niobrara River Waters*, 283 Neb. 629, 820 N.W.2d 44 (2012).

[2] See Neb. Rev. Stat. §§ 84-901(3) and 84-913 (Reissue 2008).

appropriate water under Neb. Rev. Stat. § 46-233 or § 46-259 (Reissue 2010).[3] The regulations specifically provide that a contested case is commenced by a formal objection to an application or petition.[4] So, the Department does not claim that the appellants did not properly request a contested hearing to have their rights determined.

In addition, the regulations define an "interested person" in a contested case as one "who is *or could be* adversely affected in a legally cognizable way by the outcome of a proceeding."[5] Yet under the director's view of standing, no appropriator with a preexisting permit can object to NPPD's application because even if it is approved, the appropriator would not be subject to a call by NPPD. A "call" is a senior appropriator's request that the Department shut off the water rights of upstream junior appropriators. Junior appropriators are those with a later-in-time priority date, which is the date on which the application to divert or otherwise appropriate a stream's water is filed.[6] The Department administers the call (closes the water rights of upstream junior appropriators) to satisfy the downstream senior appropriation.[7]

The director reasoned that NPPD's calls affect only upstream junior appropriators. That is, a call by NPPD could never shut off an upstream senior appropriator's superior right to use surface water. So, he concluded that only an upstream junior appropriator with a priority date after April 2007 could have standing to object to NPPD's application because only such an appropriator could be subject to a call to satisfy NPPD's latest appropriation.

The director also determined that the NRDs lacked standing to challenge NPPD's application. We have previously held that affected natural resources districts have standing to challenge a fully appropriated designation for a river basin because

---

[3] See 454 Neb. Admin. Code, ch. 7, §§ 001.01C and 001.02B (2012).

[4] See 454 Neb. Admin. Code, ch. 7, § 002.01 (2012).

[5] 454 Neb. Admin. Code, ch. 7, § 001.07 (2012) (emphasis supplied).

[6] See Neb. Rev. Stat. §§ 46-203 to 46-205 and 46-235 (Reissue 2010).

[7] See *Middle Niobrara NRD v. Department of Nat. Resources*, 281 Neb. 634, 799 N.W.2d 305 (2011).

it triggers duties for the districts that require them to spend public funds and levy taxes to taxpayers in their districts.[8] But the director rejected their claim that the appropriation would trigger a "fully appropriated" designation as too speculative to show that an actual or imminent harm will result from the Department's approval of NPPD's application. I believe that the director's conclusions are incorrect.

NPPD's application to appropriate an additional 425 cubic feet per second (cfs) of water to produce hydropower is a significant enlargement of its previous appropriations. By way of comparison, in setting the limits for irrigation appropriations, Neb. Rev. Stat. § 46-231 (Reissue 2010) provides that surface water allotments "shall not exceed one cubic foot per second for each seventy acres of land and shall not exceed three acre-feet in the aggregate during one calendar year for each acre of land for which such appropriation had been made."

Comparing NPPD's requested appropriation to irrigation allotments puts its size in perspective. There are 7.48 gallons of water in a cubic foot, or 748 gallons in 100 cubic feet.[9] An acre-foot of water is a measure of volume and, under Nebraska's statutes, equals 43,560 cubic feet[10] or 325,829 gallons of water—enough to cover an acre of land in a foot of water. Conversion tables typically equate a flow rate of 1 cfs per day to a volume of 1.98 acre-feet per day.[11] Using this measure, a stream flowing constantly at 425 cfs carries a volume of water equivalent to 841.5 acre-feet per day. This is the maximum annual irrigation allotment (3 acre-feet) for 280.5 acres in a single day. In a year, a flow rate of 425 cfs is equivalent to 307,147.5 acre-feet of water, which is the same as the maximum annual irrigation allotment for about 160 square miles.

It doesn't require a math wiz to know that NPPD's requested appropriation is a lot of water. And, if granted, the appropriation

---

[8] See *id*.

[9] See Richard S. Harnsberger & Norman W. Thorson, Nebraska Water Law & Administration § 1.02 (Butterworth Legal Publishers 1984).

[10] See Neb. Rev. Stat. § 46-228 (Reissue 2010).

[11] See Harnsberger & Thorson, *supra* note 9.

will have a significant adverse effect on the availability of water for future upstream appropriations. It is true that an appropriation to produce hydropower does not remove water from the river. But like instream appropriations, NPPD's appropriation, if approved, is an allotment that must be satisfied before junior appropriators can divert water from the stream.[12]

Yet despite the huge volume of water that NPPD requested, and despite a statutory mandate requiring the Department to promptly act on an appropriation application for the development of water power,[13] the Department sat on NPPD's application for 5 years before publishing notice of it. Notwithstanding its failure to act, the pleadings sufficiently show that the appropriation presents an imminent harm to the appellants because it is highly likely to result in a fully appropriated determination for the entire river basin.

We have set out the contours of standing many times:

> To have standing, a litigant must assert its own rights and interests and demonstrate an injury in fact, which is concrete in both a qualitative and temporal sense. The alleged injury in fact must be distinct and palpable, as opposed to merely abstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical. A party must have some legal or equitable right, title, or interest in the subject of the controversy. Finally, standing requires that the injury can be fairly traced to the challenged action and is likely to be redressed by a favorable decision.[14]

Here, both Higgins and the NRDs have alleged sufficient facts to show that they would be adversely affected by the Department's approval of NPPD's application. Higgins alleged that his February 2007 application for an appropriation is still pending. But if the Department determines that the Lower Niobrara River Basin is fully appropriated, it must place an

---

[12] See *Central Platte NRD v. State of Wyoming*, 245 Neb. 439, 513 N.W.2d 847 (1994).

[13] See Neb. Rev. Stat. § 46-234 (Reissue 2010).

[14] *Butler Cty. Sch. Dist. v. Freeholder Petitioners*, 283 Neb. 903, 907, 814 N.W.2d 724, 728 (2012) (citations omitted).

immediate stay on any new appropriations, including Higgins' request.[15] In addition, Higgins alleged that the designation will increase his property taxes to fund water management by the local natural resources districts. As mentioned, we have held that affected natural resources districts have standing to challenge a fully appropriated determination for that reason.[16] And under the Department's current regulations, a fully appropriated determination is not a remote possibility.

The Department concedes that it has not amended its regulations since 2011 when we decided *Middle Niobrara NRD v. Department of Nat. Resources*.[17] And those regulations require it to determine that a river basin is fully appropriated if the most junior appropriator could not divert enough surface water to meet the Department's minimum irrigation requirements for 70 acres of corn during the growing season.[18] This is the Department's method of determining whether there is a dependable water supply for another appropriator.

In addressing the question of who, if not the appellants, would have standing, the Department claimed at oral arguments that an appropriator with a later priority date than NPPD's application date existed. Because that appropriator would be subject to a call to satisfy NPPD's newest appropriation, it would have standing to object. Leaving aside whether the existence of an upstream junior appropriator is plausible, NPPD's application shows that if its appropriation is approved, it is highly unlikely that this most junior appropriator could obtain enough water to dependably irrigate 70 acres of corn. If not, the river basin would be fully appropriated. And this result is illustrated by NPPD's own flow rates at Spencer Dam.

In NPPD's application to use the river's natural flow for power, it provided a chart with the daily mean (average) flow rates through its hydropower units at Spencer Dam for the

---

[15] See Neb. Rev. Stat. § 46-714(1) (Reissue 2010).

[16] See *Middle Niobrara NRD, supra* note 7.

[17] *Id*.

[18] See *id*., citing 457 Neb. Admin. Code, ch. 24, § 001-01A (2006).

years 2004 through 2006. As the majority opinion states, NPPD already has existing appropriations for surface water that equal 2,035 cfs. If the Department grants NPPD's application for an additional 425 cfs, it will have total appropriations of 2,460 cfs. But NPPD's flowchart shows that for the 3 documented years, 2,460 cfs was the highest average daily flow rate that ever ran through its hydropower units and that Spencer Dam rarely received that flow rate.

Specifically, in 2004, there were no days that Spencer Dam received an average flow rate of 2,460 cfs. In 2005, there were only 4 days that the dam received an average flow rate of 2,460 cfs. In 2006, there were only 2 days that the dam received an average flow rate of 2,460 cfs. In total, Spencer Dam received an average daily flow rate of 2,460 cfs for only 6 days out of 3 years. So if NPPD's appropriations had totaled 2,460 cfs during the years 2004 through 2006, the river's streamflow likely would have been insufficient to conclude that enough water was available for an upstream, junior appropriator to meet the Department's irrigation standards.

It is true that the Department may not determine that the surface water of a river is fully appropriated by comparing a senior appropriation right to the streamflow values at a specific diversion point or streamflow gauge.[19] Its current regulations specifically require it to use streamflow data and diversion records to project whether the most junior appropriator could divert sufficient water to meet its irrigation standards.[20] But under § 46-235, the Department must minimally determine that there is unappropriated water in a stream before approving a new application to appropriate water. And if the last-in-time appropriation would rarely have been satisfied, the river's streamflow likely would not have been a dependable water source for any subsequent appropriation from 2004 through 2006.

Moreover, in 2007, the Department closed the diversion rights of about 400 upstream junior appropriators to satisfy

---

[19] See *id*.

[20] See *id*.

NPPD's existing appropriations of 2,035 cfs.[21] The Department later determined that the river basin was fully appropriated because the river's surface water was insufficient to sustain existing appropriations.[22] We reversed and vacated that determination based on the Department's arbitrary application of its regulations for determining that there was insufficient water. We did not, however, decide whether the river basin was fully appropriated, and the Department has never revised its conclusion regarding the basin's 2008 status. Nor do we have its determinations for the years since 2008.

But Spencer Dam sits downstream near the eastern end of the Niobrara River.[23] So the scarcity of days in which Spencer Dam actually received an average flow rate of 2,460 cfs between January 2004 and December 2006, and the Department's 2007 actions support the appellants' allegations of imminent harm. In short, if Spencer Dam rarely receives 2,460 cfs, then the Department's approval of NPPD's increased appropriation to a total of 2,460 cfs will drastically increase the chances that in any given year, the Department will declare the river's surface water to be fully appropriated. Under its current regulations, that finding will trigger a fully appropriated designation for the entire river basin.

Moreover, even if the Department did not declare that the river basin was fully appropriated, a farmer or rancher with an existing appropriation obviously has an interest in whether he can ever seek an additional appropriation. And the Department's approval of NPPD's application will greatly decrease the availability of water for future appropriations.

This court has never held that a landowner with an existing appropriation must show a definite injury to have standing to challenge new appropriations from the same water source. Our holdings on standing in water cases have generally been confined to concluding that a political subdivision lacks standing

---

[21] See *id*., citing *In re 2007 Appropriations of Niobrara River Waters, supra* note 1.

[22] See *id*.

[23] See *id*.

to challenge an application when it is representing the interests of third parties, instead of its own interests.[24]

In contrast, we have explicitly recognized that landowners with an existing appropriation can object to a later application to appropriate water from the same water source. For example, in *Ponderosa Ridge LLC v. Banner County*,[25] a county, a natural resources district, and three individuals filed objections to a corporation's application to transfer 1,532 acre-feet of water per year from its well in Nebraska to its pig production facilities in Wyoming. Only two of the individuals had existing water rights. The Department denied the corporation's application. On appeal, we held that only the individuals with existing water rights had standing to object. We did not, however, require them to show that the transfer of water to Wyoming would actually deplete the water that was available to them.

Similarly, in *Hagan v. Upper Republican NRD*,[26] we held that landowners had standing in a declaratory judgment action to challenge a natural resources district's allegedly illegal agreement to grant additional ground water to other landowners after the district had denied the plaintiffs' request for a variance. The plaintiffs alleged that the defendants drew water from the same aquifer that was underlying the plaintiffs' land.

Specifically, they alleged that "'there is less water available for them for future requests in that the now declining water table of the aquifer will decline further by virtue of the withdrawal of the water by the Defendants.'"[27] Relying on our decisions in *Ponderosa Ridge LLC* and *Ainsworth Irr. Dist. v. Bejot*,[28] we held that the plaintiffs' allegation that

---

[24] See, e.g., *Central Neb. Pub. Power Dist. v. North Platte NRD*, 280 Neb. 533, 788 N.W.2d 252 (2010); *Metropolitan Utlities Dist. v. Twin Platte NRD*, 250 Neb. 442, 550 N.W.2d 907 (1996).

[25] *Ponderosa Ridge LLC v. Banner County*, 250 Neb. 944, 554 N.W.2d 151 (1996).

[26] *Hagan v. Upper Republican NRD*, 261 Neb. 312, 622 N.W.2d 627 (2001).

[27] *Id.* at 315, 622 N.W.2d at 629.

[28] *Ainsworth Irr. Dist. v. Bejot*, 170 Neb. 257, 102 N.W.2d 416 (1960).

the natural resources district's agreement would deplete the source of water in which they held an interest was sufficient to confer standing to object to the agreement. Their alleged harm was obviously a threatened future injury—not a present actual injury.

The appellants cite all of these cases, and they are directly on point. Yet the majority opinion fails to address them. Instead, the opinion relies on a statement from *Central Neb. Pub. Power Dist v. North Platte NRD*.[29] But that reliance is incorrect here.

In that case, a public power and irrigation district (Central) operated a large reservoir that was used for several purposes, including to distribute water for irrigation and to generate hydropower. Central objected to a natural resources district's proposed regulations to reduce ground water pumping in the basin of one of its tributaries. Central argued that the reduction was inadequate to restore the tributary's historic streamflow. It sought a court order reversing the natural resources district's decision and directing it to impose greater restrictions. The court concluded that Central was not in the district's territory and that, as a surface water appropriator, it was not affected by ground water appropriations in the district.

On appeal, we discussed *Ponderosa Ridge LLC*, *Hagan*, and two other cases to illustrate when a party has or has not alleged a sufficient interest to confer standing. We contrasted our holdings that political subdivisions lacked standing when they do not assert their own interests with our holdings that landowners with water interests to protect do have standing to object. Regarding Central's broad claim that ground water pumping in the tributary's basin was destroying the reservoir, we concluded that the allegation of an injury was too attenuated and that its theory of causation could not be limited to any direct tributary. We also noted that it was unclear that an order requiring a further reduction of ground water pumping would increase the water available for Central's reservoir because it would first be available to the tributary's surface water appropriators.

---

[29] *Central Neb. Pub. Power Dist., supra* note 24.

Our primary holding, however, was that Central lacked standing because it was not asserting its own interests. Instead, we concluded that it was asserting the interests of the public or its constituents for whom it held appropriations and managed water resources. In dicta, we stated that even on behalf of its constituents, Central had not alleged an injury with sufficient particularity:

> For example, even if we infer that less water is available to the U.S. Fish and Wildlife Service for endangered species, Central did not allege that the reduced amount of water fell short of what was required or even desirable for that purpose. Nor did Central allege that reduced water delivery to canal operators impaired the operation of their canals. Similarly, although Central alleges that it has its own interest in generating power . . . , it did not allege that it was less able to generate power as a result of the NRD's conduct, nor did it allege that less power was available to its customers. *It is axiomatic that any use of a limited resource necessarily results in marginally less availability of that resource for potential use by others. An injury in fact, for standing purposes, requires a more particularized harm to a more direct, identified interest.*[30]

The majority opinion's reliance on this italicized language is misplaced. Whether Central had sufficiently alleged an injury to its constituents was not a necessary conclusion to our holding that it lacked standing because it was not asserting an injury to its own interests. As we know, a case is not authority for any point made that was not necessary to decide the case.[31]

But even if it were not dicta, the statement should not be interpreted to require a showing of actual harm from a later appropriation. We specifically discussed *Ponderosa Ridge LLC* and *Hagan* as examples of when a party has alleged a sufficient interest to confer standing. Because we did not

---

[30] *Id*. at 543-44, 788 N.W.2d at 261 (emphasis supplied).

[31] See *Geddes v. York County*, 273 Neb. 271, 729 N.W.2d 661 (2007).

disturb those holdings, the majority opinion incorrectly relies on a single statement that is inconsistent with the rest of the opinion. Instead, we should recognize that our concern was Central's failure to allege a connection between ground water pumping in another area to its own injury. Those waters may or may not have been hydrologically connected, but the appropriations were certainly not from the same water source, as in the previous cases that we cited with approval. So this statement can only be applied to an objector with an existing appropriation from the same water source by taking it out of context.

Moreover, the probable future injury that existed in *Ponderosa Ridge LLC* and *Hagan* is also sufficient to confer standing under the standing rules that we have adopted from federal courts.

Federal courts have repeatedly held that an actual or threatened injury is sufficient to confer standing.[32] And we have repeatedly held that the alleged injury must be actual *or* imminent.[33] Imminent means "ready to take place: near at hand: impending: . . . hanging threateningly over one's head: menacingly near."[34] It does not mean absolutely certain to occur, nor do federal courts apply it in this manner.[35] These cases show that the requirements of a "threatened" or

---

[32] See, e.g., *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 106 S. Ct. 1326, 89 L. Ed. 2d 501 (1986); *Valley Forge College v. Americans United*, 454 U.S. 464, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S. Ct. 1601, 60 L. Ed. 2d 66 (1979); *Warth v. Seldin*, 422 U.S. 490, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644 (9th Cir. 2011); *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274 (6th Cir. 2009); *Sutliffe v. Epping School Dist.*, 584 F.3d 314 (1st Cir. 2009); *Cooper v. U.S. Postal Service*, 577 F.3d 479 (2d Cir. 2009); *Doe v. Tangipahoa Parish School Bd.*, 494 F.3d 494 (5th Cir. 2007).

[33] See, e.g., *Butler Cty. Sch. Dist., supra* note 14; *Middle Niobrara NRD, supra* note 7; *Central Platte NRD, supra* note 12.

[34] Webster's Third New International Dictionary of the English Language, Unabridged 1130 (1993).

[35] See, generally, 13A Charles Alan Wright et al., Federal Practice and Procedure § 3531.4 (2008).

"imminent" injury are related concepts. And standing and its injury-in-fact requirements are jurisdictional rules that we have adopted from federal courts to define those cases that are appropriately resolved through the judicial process.[36] Long before we adopted the U.S. Supreme Court's injury-in-fact rule in 1993,[37] we had explicitly referred to an actual or threatened injury to explain standing requirements: "'The questions are, does he have a private individual right involved in controversy, is there a justiciable issue involving the right presented to the court, *and is or will that right be threatened or violated*?'"[38]

Obviously, the Legislature did not intend for the Department's actions to go unchallenged, and § 61-206 clearly contemplates some interested party's having an opportunity to be heard. To require a party in a water case to allege an actual injury, as distinguished from the party's own interest in the same water source that will probably be injured, is an impossible burden: "[W]ater use on most streams is like the federal budget. No one really knows how much water is actually being put to beneficial use by how many people."[39] And the Department's own regulations reflect this reality by recognizing that an "interested person" is someone "who is or could be adversely affected . . . by the outcome of a proceeding."[40]

The Department's definition of "interested person" distinguishes this case from those in which we have interpreted this term in a statute to mean a person with common-law standing.[41] The statutes in those cases did not define the term, and

---

[36] See, *Central Neb. Pub. Power Dist., supra* note 24; *State v. Baltimore*, 242 Neb. 562, 495 N.W.2d 921 (1993); *Mullendore v. Nuernberger*, 230 Neb. 921, 434 N.W.2d 511 (1989).

[37] See *Baltimore, supra* note 36.

[38] See *Nebraska Seedsmen Assn. v. Department of Agriculture & Inspection*, 162 Neb. 781, 784, 77 N.W.2d 464, 465 (1956) (emphasis supplied), quoting *Schroder v. City of Lincoln*, 155 Neb. 599, 52 N.W.2d 808 (1952).

[39] A. Dan Tarlock, Law of Water Rights and Resources § 5:15 at 248 (2013).

[40] 454 Neb. Admin. Code, ch. 7, § 001.07.

[41] See, *Middle Niobrara NRD, supra* note 7; *Metropolitan Utilities Dist., supra* note 24.

the question whether the regulations defined the term was not raised. But an agency's regulations that are properly adopted and filed with the Secretary of State of Nebraska have the effect of statutory law.[42] So even if a probable, future injury were not an imminent injury, the majority opinion fails to acknowledge that the Department's regulations would confer broader standing than common-law standing. And those regulations are consistent with our previous case law on the subject.

Given the legislative intent that someone have standing to object and the Department's own regulations, I believe that our injury-in-fact requirement for standing should be interpreted to the fullest extent in water cases. I do not believe that recognizing standing here would mean that the appellants could object to every application for an appropriation. In most circumstances, the Department is not even required to give notice of an application. More important, the appellants have standing here only because NPPD's own application illustrates the high probability that this appropriation would render the river fully appropriated. A court's impartiality is never called into question by its observance of objective facts that confer standing. It seems to me that ignoring those facts poses a bigger problem.

Moreover, to apply our standing rules more strictly than federal courts to avoid a challenge here is particularly worrisome because the appellants can never challenge the appropriation once the Department approves it. The majority knows that neither the appellants nor anyone else can challenge this appropriation request once it is approved. We have held that such challenges are impermissible collateral attacks.[43] So NPPD's appropriation will continue until abandoned or forfeited. And each year it will significantly increase the risk that the river is fully appropriated.

That designation will impose duties on the affected NRDs that will obviously affect their resident taxpayers. It will also

[42] *Middle Niobrara NRD, supra* note 7.

[43] See, e.g., *In re Applications T-851 & T-852*, 268 Neb. 620, 686 N.W.2d 360 (2004).

greatly increase the odds that even if upstream farmers or ranchers can obtain another appropriation in the future, they will pay NPPD for their use of the water. And because of our collateral attack rule, the appellants' standing to challenge a fully appropriated designation will be meaningless.

One more point, and I am done. We have recognized that the stage of the litigation is an important factor in deciding standing. In *Hagan*, for example, the fact that the litigants were still at the pleading stage was specifically tied to our conclusion that the landowners had standing:

> Whether the plaintiffs will be able to present evidence to substantiate these allegations, either at trial or on hearing for summary judgment, is a matter that was not before the district court and is not before us. In other words, the defendants are not precluded from preserving and/or asserting a standing challenge at a later time if the plaintiffs are unable to prove that the defendants' use of the underground water would so deplete the aquifer as to injure the plaintiffs' water use interests. The plaintiffs, however, have adequately pled that the depletion of the aquifer will injure their water use interests, and in reviewing a demurrer, we are required to accept this fact as true and not to consider the evidence that might be adduced at trial.[44]

In another water case, we have recognized that at the pleading stage, a determination of standing depends upon whether a plaintiff has alleged an injury in fact and whether discovery is likely to reveal evidence of that injury.[45] And we have stated that "[a]t the pleading stage, the standard for determining the sufficiency of a complaint or petition to allege standing is fairly liberal."[46]

The appellants correctly contend that our decisions are consistent with U.S. Supreme Court precedent: "At the pleading stage, general factual allegations of injury resulting from the

---

[44] *Hagan, supra* note 26, 261 Neb. at 318-19, 622 N.W.2d at 631-32.

[45] See *Central Neb. Pub. Power Dist., supra* note 24.

[46] *Field Club v. Zoning Bd. of Appeals of Omaha*, 283 Neb. 847, 853, 814 N.W.2d 102, 107 (2012).

defendant's conduct may suffice, for on a motion to dismiss we 'presume[e] that general allegations embrace those specific facts that are necessary to support the claim.'"[47] The Court has further stated that in determining whether a party has standing, a court should consider the legislative intent in the statutory scheme.[48]

The stage of the proceeding is particularly relevant here because the Department is purported to be considering amendments to its regulations. So the appellants have no way of accurately predicting how NPPD's new appropriation could affect the river basin's status if the Department grants it. But they know what is likely to occur under the Department's existing regulations.

Obviously, discovery could reveal that the appellants' challenge is without merit or that the alleged threat of harm is remote. For instance, discovery might show that the river's average flow rates are much greater than indicated by NPPD's flowchart at Spencer Dam, or that the Department has amended its regulations in a way that makes a fully appropriated determination unlikely even if the Department approves NPPD's application.

But contrary to the reasoning of the majority opinion, bulletproof certainty is not required at the pleading stage of litigation. And if a Nebraska farmer or rancher with an existing interest in the availability of water in a stream doesn't have standing to object to a large appropriation from that stream, who does?

As the separate dissent and concurrence illustrates, the majority's abandonment of our standing rules and twisting of our case law flow from the majority's fear that recognizing standing here will open the litigation floodgates in water disputes. That fear is unfounded. I am not contending that the appellants should or will prevail. Nor am I contending that every Nebraskan should have standing to object to an

---

[47] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

[48] See *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982).

appropriation application. But standing is determined as it exists when the litigation is commenced.[49] So to hold that existing appropriators do not have standing to object to an appropriation application effectively ensures that no one has standing to object because no appropriator junior to the application will normally exist.

Because the Department's actions affect so many lives and livelihoods, I believe this result is a mistake. The majority's holding will allow the Department to act with impunity because its grant of new appropriations will be immune from adversarial challenge and judicial review. The majority's opinion puts the appellants in a legal straitjacket. And this result is not required by, nor consistent with, our previous decisions on standing in water cases or the Department's own regulations.

In sum, the information submitted with NPPD's own application is sufficient to show at the pleading stage that the alleged injury is imminent, not remote or speculative. But to affirm the director's order, the majority opinion has ignored NPPD's flowchart; ignored the Department's own actions and regulations; distorted our standing standards in a manner that will preclude standing in many future cases; and ignored our case law upholding standing for landowners in similar cases. Its conclusion that the appellants' alleged injury is too speculative rests almost entirely upon a single misconstrued statement made in dicta.

_____

[49] See *id.*

_____

IN RE PETITION OF ANONYMOUS 5, A MINOR.
___ N.W.2d ___

Filed October 4, 2013.    No. S-13-510009.

1.  **Abortion: Minors: Physicians and Surgeons.** Generally, an abortion cannot be performed upon an unemancipated pregnant woman under 18 years of age unless a physician obtains the notarized written consent of both the pregnant woman and one of her parents or a legal guardian.